**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOSHUA K.,[1]

           Plaintiff,

           v.

FRANK BISIGNANO,
Commissioner of Social Security,

           Defendant.

No. 1:23-CV-04344

Judge Edmond E. Chang

**MEMORANDUM OPINION AND ORDER**

Joshua K. appeals the Social Security Commissioner's denial of his disability-benefits application.[2] R. 1, Compl. ¶¶ 4–7.[3] An Administrative Law Judge (commonly called an ALJ) determined that Joshua was not disabled, and thus not entitled to disability benefits, because he still had the ability to work certain jobs. R. 9-1, Admin. Record Vol. 1 (AR1) at 23–30.[4] Joshua contends that the ALJ's decision was error that requires remand or reversal, R. 12, Pl.'s Br., and the government in response moves for summary judgment, asking to affirm the Commissioner's decision, R. 16, Def.'s

---

[1]Consistent with this district's internal operating procedures, the Court refers to the Plaintiff only by his "full first name and the first initial of the last name." N.D. Ill. Internal Op. P. 22.

[2]This Court has subject matter jurisdiction over this case under 42 U.S.C. §§ 405(g), 1383(c)(3).

[3]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[4]Citations to either volume of the Administrative Record refer to the page numbers in the bottom-right corner.

Mot. For the reasons set forth below, the government's motion is denied, and Joshua's motion is granted to the extent that the Court vacates the Commissioner's denial and remands the matter to the ALJ for further consideration.

## I. Background

Joshua first applied for disability benefits in March 2021. AR1 at 172. In the application, Joshua alleged a disability onset date of November 30, 2020. *Id.* at 174. The application was initially denied in October 2021 and denied again on reconsideration in February 2022. *Id.* at 80, 91. Joshua then requested a hearing in front of an ALJ, *id.* at 96; the hearing was held in September 2022, *id.* at 37. The ALJ then issued an opinion finding that Joshua was not disabled because he was able to do some types of work that are available in the national economy. *Id.* at 17–30. On May 2, 2023, the Appeals Council for the Social Security Administration denied Joshua's request to review the ALJ's decision, *id.* at 1, so the ALJ's ruling became the final decision of the Commissioner, 20 C.F.R. §§ 404.955(b), 404.981. Joshua timely filed his complaint in federal court, seeking review of the ALJ's decision. *See* Compl.

### A. Factual Background

The Administrative Record supplies the factual background of this case. At the time of the ALJ hearing, Joshua was 41 years old and had a high school education. AR1 at 29, 37. Joshua worked for more than 20 years as a construction worker and supervisor before stopping work in December 2020 on account of his physical ailments. *Id.* at 202–03.

2

Joshua claims that his multiple physical conditions—neck, shoulder, back, and hip pain; degenerative joint disease; fibromyalgia; and chronic fatigue—prevented him from working as of November 30, 2020, when he seemingly began the process of leaving his job. AR1 at 70, 202. For these medical conditions, he saw Dr. Pauline Harding. AR1 at 380–85. His earliest-in-time medical records show complaints during a telehealth appointment on November 17, 2020, of shoulder, back, and hip pain. *Id.* at 299. At an in-person visit on November 30, weakness was noted in his right arm and pain was documented in his right hip. *Id.* at 305. After this visit, Joshua was prescribed pain-relieving ointment and medication. *Id.* at 306. Across a series of telehealth examinations over the next few months, Joshua consistently self-reported moderate-to-severe pain as well as difficulty or slowness with daily activities, and his pain medications were adjusted on occasion. *Id.* at 299–300, 309–44. During these months, he also received imaging: x-rays showed no acute fractures, and MRIs revealed mild-to-moderate pain and degeneration in his joints. *Id.* at 285–92, 294, 396–97.

In the first six months of 2021, during telehealth appointments, Joshua described complaints of persistent pain to his doctor. AR1 at 335, 346, 357, 368. Joshua also told Dr. Harding that he had seen another doctor about his shoulder pain and had received an injection in January 2021, but that did not help alleviate his pain. *Id.* at 346. And when filling out an August 2021 function report for his disability-benefits application, Joshua again reported struggling with daily activities—like

getting out of bed, feeding pets, shaving and bathing, making simple meals, and sitting. *Id.* at 214–26.

In August 2021, Joshua returned in person to Dr. Harding. R. 9-2, Admin. Record Vol. II (AR2) at 800. Again, Joshua told her that he had shoulder, back, and hip pain, and he again described struggling to walk, sit, grocery shop, or get out of bed. *Id.* Dr. Harding observed that Joshua sometimes struggled to focus or speak because of his pain. *Id.* at 807. And she noted that he had an antalgic gait (or limp) and deterioration in the strength of his right arm since his last in-person visit in November 2020. *Id.* at 808.

A month later, a different physician conducted another consultative examination of Joshua, this time on behalf of the Bureau of Disability Determination Services, a state agency. AR1 at 523–30; *see also Heckler v. Day*, 467 U.S. 104, 106–07 (1984) (outlining disability-claim process). At this examination, Joshua also reported struggling with daily activities: if he sat, stood, or drove for very long, he would experience pain; he needed a break after walking 300 feet; and he could not cook food other than by microwave. AR1 at 524. Although this doctor similarly observed limitations on Joshua's strength and range of motion, the doctor thought Joshua's issues were lesser in magnitude. *Id.* at 525–29. But like Dr. Harding, this doctor noted that Joshua's gait was antalgic and that Joshua had tenderness in his shoulder, back, and hip. *Id.* at 525. The doctor also observed, however, that Joshua could get on and off the examination table without difficulty and walk 50 feet without support. *Id.* The doctor

4

ultimately determined that Joshua had degenerative disc disease in his spine and right hip as well as limited range of motion in his right shoulder. *Id.* at 526.

In November 2021, across a two-week period, Joshua underwent several examinations at the Mayo Clinic in Rochester, Minnesota. AR1 at 645–708; AR2 at 709–25. An initial assessment noted "significant symptoms": an antalgic gait because of pain in his right hip and numbness on his right side. AR2 at 724. Joshua also had joint and back pain, but he did not have any observed range-of-motion limitations. *Id.* at 723–24. An x-ray showed some "degenerative changes" to his spine. AR1 at 680. One doctor examined Joshua's shoulder, concluding that it was generally tender and painful but that there was not weakness in his rotator cuff specifically. *Id.* at 700–03. So Joshua received another injection in his shoulder. *Id.* at 671. Joshua also saw a spine doctor, who determined that his pain is "rather widespread," so the doctor did not think Joshua "would benefit from injections" or from surgery. *Id.* at 670. The spine doctor suspected that Joshua might have fibromyalgia. *Id.*

That suspicion turned out to be right. After an electromyogram came back normal (thus ruling out other neurological causes), AR1 at 645, 654–56, 670, another doctor evaluated Joshua for fibromyalgia, *id.* at 645–51. Joshua presented with "widespread pain" and 18/18 tender points. *Id.* at 646. So the doctor diagnosed Joshua on November 15, 2021, with fibromyalgia and chronic fatigue syndrome. *Id.*

Joshua also continued seeing Dr. Harding. This included three telehealth appointments in March 2022—one concerning his pain and physical condition, and the other two involving conditions unrelated to this case (mostly about a respiratory

5

illness after he was exposed to someone with COVID). AR2 at 749–87. In June, Joshua again saw Dr. Harding via telehealth appointment for his pain and fatigue, and he chronicled similar symptoms and difficulties with his daily activities. *Id.* at 735–48. And in August, Joshua reported consistent struggles and also relayed that an orthopedic surgeon advised him that physical therapy would not be useful where he had disc protrusions. *Id.* at 854–56.

### B. Disability Determination Process

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4). The test requires the Commissioner to consider: (1) whether the claimant has performed any substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether he is

able to perform any other work existing in significant numbers in the national economy. *Id.* §§ 404.1520(a)(4), (g), 404.1560(c); *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

If the answer to Steps 1 or 2 is "no"—that is, the claimant performed substantial gainful activity or lacks a severe impairment—then the Commissioner will reach a finding of "not disabled." *See Zurawski*, 245 F.3d at 886. Otherwise, the Commissioner moves on to Step 3. If Step 3 is answered in the affirmative, and the claimant's impairment is listed as one that precludes substantial gainful activity *per se*, then the claimant is found to be disabled. *Id.* If not, then the Commissioner must determine the claimant's residual functional capacity—that is, the sort of work that the claimant can still perform given his impairment—and assess whether that capacity allows the claimant to perform either his past work (Step 4) or any other work existing in significant numbers in the national economy (Step 5). *Id.* If it does not, then the claimant is disabled. *Id.* The claimant bears the burden of proof at Steps 1 through 4. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886. After that, it is up to the Commissioner to establish that the claimant is capable of performing work that exists in significant numbers in the national economy. *Zurawski*, 245 F.3d at 886.

### C. The Administrative Process

Joshua's disability-benefits application was first considered by two state-agency physicians who reviewed his medical file. The first state-agency physician determined in September 2021 that Joshua's medical impairments could explain his pain and symptoms but concluded that Joshua's statements about the intensity,

persistence, and limitations of his pain were only partially consistent with the objective evidence. AR1 at 64. The first state-agency physician thus deemed Joshua to have the residual functional capacity to perform light work activity. *Id.* at 64–65. Joshua requested reconsideration of that decision, *see Kaplarevic v. Saul*, 3 F.4th 940, 942 (7th Cir. 2021) (citing 20 C.F.R. § 404.1503); 20 C.F.R. § 404.907, so a second state-agency physician in February 2022 reviewed his application and any new evidence, AR1 at 70–77. The second state-agency physician noted Joshua's intervening diagnoses of fibromyalgia and chronic fatigue but again determined that Joshua had the same residual functional capacity to perform light work. *Id.* at 70, 72, 76–77.

Joshua then sought review by an ALJ. At the September 2022 hearing, Joshua testified about his struggles with daily activities: he had fallen seven times in the six months leading up to the proceeding because his right leg gave out; he took 45 minutes to button a dress shirt; it was difficult for him to use utensils or writing instruments; he could sit for only five to ten minutes at a time; he could walk continuously only 150 feet, even with a cane; he had difficulty carrying a gallon of milk; and he had to use a grabber to pick things up off the ground. AR1 at 41–44, 46, 49, 51. Joshua also explained that he generally avoided opiate-based medication because he felt "nauseous and loopy" and did not like how he felt. *Id.* at 44–45.

The vocational expert, Thomas Heiman, also testified at the hearing. AR1 at 53. The ALJ asked Heiman about jobs in the national economy at both the light and sedentary levels that someone of Joshua's age, education, and experience could perform. *Id.* at 56–58. And the ALJ added some limitations that, in her view, accounted

8

for Joshua's physical limitations. *Id.* For each set of limitations, Heiman provided a set of jobs that existed in significant numbers in the national economy. *Id.* Joshua's lawyer then asked Heiman a set of questions about whether any jobs existed in the national economy for someone who could not reach often with their dominant hand, for someone who could only rarely lift ten pounds, or for someone who required a sit-stand option and breaks. *Id.* at 59–60. To each hypothetical, Heiman stated that no such jobs existed. *Id.*

The ALJ issued a written decision one month later, walking through the five-step process. At Step 1, the ALJ determined that Joshua had not engaged in substantial gainful activity since his alleged onset date, November 30, 2020. AR1 at 19. At Step 2, the ALJ concluded that Joshua had several severe impairments: mild sacroiliac degenerative joint disease, degenerative disc disease in his lumbar and cervical spine, right shoulder rotator cuff tendinopathy without tear of labrum, and fibromyalgia. *Id.*[5] At Step 3, the ALJ found that Joshua's impairment was not severe enough to match an impairment listed in the regulations as precluding any possible gainful activity. *Id.* at 21–22. At Step 4, the ALJ determined that Joshua could not perform his past work. *Id.* at 28–29.

---

[5]The ALJ also determined that Joshua had several non-severe impairments—obesity, asthma, and tinnitus. AR1 at 20. And the ALJ concluded that Joshua's depression was not medically determinable. *Id.* at 21. Because these conditions are not important to the core dispute in this case, the Court has not detailed them further.

9

Finally at Step 5, the ALJ concluded that Joshua had the residual functional capacity—that is, the ability to do work despite his severe impairments—to perform sedentary work. AR1 at 23–28. The ALJ listed a range of limitations:

> [T]he claimant is further limited to the following: occasionally climbing ramps or stairs, but never ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, or crawling; frequently reaching in any direction with the right upper extremity; avoiding dangerous moving mechanical parts and unprotected heights; and avoiding extreme cold and heat.

*Id.* at 23. The ALJ arrived at this assessment in a similar fashion as the state-agency physicians because the ALJ concluded that Joshua's "physical impairments did not result in the degree of functional limitation alleged by" Joshua. *Id.* at 27. The ALJ emphasized that many of Joshua's appointments with Dr. Harding were telehealth appointments, so Dr. Harding could not verify the severity of Joshua's symptoms first-hand. *Id.* at 27–28. The ALJ then reasoned that, because Dr. Harding treated Joshua with only some medication instead of "more aggressive forms of treatment, such as repeated injections or discussions of surgery," Dr. Harding's assessment of Joshua's limitations should be discounted. *Id.* at 28. The ALJ also cited Joshua's imaging results, which the ALJ noted "showed only mild deficits." *Id.* at 27. The ALJ also concluded that Joshua was able to perform daily activities, "just at a slower pace." *Id.* But the ALJ departed from the state-agency physicians' decision to limit Joshua to light work; instead, she concluded that more restrictions (chiefly, that Joshua could perform only sedentary work) were necessary to accommodate his fibromyalgia, pain, and "exam deficits." *Id.* at 27–28.

10

Based on the residual functional capacity that she assigned to Joshua, the ALJ found that there were jobs Joshua could perform. AR1 at 29–30. Remember that at this stage, the burden of proof shifts to the government to establish that there are significant numbers of jobs in the national economy that Joshua would be able to do. 20 C.F.R. § 404.1560(c); *Zurawski*, 245 F.3d at 886. Relying on the vocational expert's testimony, the ALJ determined that, even with his limitations, Joshua could work as a charge-account clerk (DOT 205.367-014); document preparer, microfilming (DOT 249.587-018); and lens inserter (DOT 713.687.026). AR1 at 30.

## II. Legal Standard

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. 42 U.S.C. § 405(g). The Appeals Council's decision not to review an ALJ's ruling constitutes a final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009). A decision must be reversed if the Commissioner committed an error of law or if the record as a whole does not contain substantial evidence to support the Commissioner's findings. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). If there is an error of law, then reversal is warranted, regardless of how much evidence supports the final determination. *Schmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980). A decision contains an error of law when it fails to comply with the Commissioner's regulations. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (reversing decision that did not comply with regulation concerning weight given to treating physician).

Although this Court reviews the ALJ's legal decisions *de novo*, the ALJ's factual determinations are granted deference and must be affirmed so long as they are supported by substantial evidence on the record. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Evidence is "substantial" if a reasonable person would accept it as adequate to support the ALJ's decision. *Id.* "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors the ALJ's ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634–35 (7th Cir. 2007); *see also Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence." (collecting cases)). Although the ALJ is not required to discuss every piece of evidence in the record, the ALJ "must provide a logical bridge between the evidence and the conclusions so that [the Court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones*, 623 F.3d at 1160 (cleaned up).[6] "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

---

[6]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

### III. Analysis

Joshua challenges the ALJ's assessment of his residual functional capacity to work and the resulting determination of what jobs are available to him in the national economy. Pl.'s Br. The government contends that the ALJ's decision rests on substantial evidence and thus must be affirmed. Def.'s Mot.; R. 17, Def.'s Br. The Court generally agrees with Joshua that the ALJ's opinion is flawed in crucial ways: the failure to assess fibromyalgia properly, *see* Pl.'s Br. at 7–8, 14; the failure to reconcile the varying accounts of Joshua's pain and his inability to perform daily activities, *see id.* at 9–10; and the failure to afford proper weight to Dr. Harding's evaluations, *see id.* at 1–2, 13. These gaps in reasoning in turn undermine the ALJ's analysis of Joshua's residual functional capacity at Step 5, where the government shoulders the burden. *Caldarulo v. Bowen*, 857 F.2d 410, 412–13 (7th Cir. 1988). Although the ALJ is owed considerable deference under the substantial-evidence standard, remand is required because of these intertwined problems, as explained next.

First up is that Joshua suffers from fibromyalgia, a condition that the government does not acknowledge in its brief. *See generally* Def.'s Br. To be sure, Joshua faces a high bar here: he must show that the ALJ's evaluation of his fibromyalgia symptoms was "patently wrong." Def.'s Br. at 7; *Pufahl v. Bisignano*, 142 F.4th 446, 458 (7th Cir. 2025) (cleaned up). But Joshua meets this burden. To start, the ALJ relied on Joshua's "mild" imaging results, his lack of "any musculoskeletal impairment," and a "normal" electromyogram. AR1 at 27. But none of these tests capture the effects of fibromyalgia, which causes pain that "cannot be measured with objective

13

tests." *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018). The ALJ and Joshua agree (and the government does not contest) that he does suffer from fibromyalgia—as diagnosed by doctors at the Mayo Clinic—so the ALJ improperly dismissed his fibromyalgia-induced pain as mild based largely on inapt test results. *See Lanzi-Bland v. Berryhill*, 2017 WL 4797529, at *4 (N.D. Ill. Oct. 24, 2017) ("[T]he testing the ALJ relied upon … is precisely the type of testing that doctors frequently use to *rule out* other conditions in diagnosing fibromyalgia." (emphasis in original)).

The Court also concludes, as argued by Joshua, Pl.'s Br. at 8, 14, that some of the test results and observations were not as favorable as the ALJ recounted. At times, the ALJ referred to Joshua's imaging results as "show[ing] only mild deficits" when in fact his records also show some "moderate" tendinopathy and stenosis . *Compare* AR1 at 27 *with id.* at 287, 289–90, 294. And although the ALJ found that Joshua could walk 50 feet with "no issues," the medical exam that she cites in fact says that Joshua could do so only with an antalgic gait, which could reflect his pain symptoms, and that Joshua could not perform a toe-heel walk. *Compare id.* at 27 *with id.* at 525. Nor is this observation inconsistent with Joshua's claim that he could not walk more than 300 feet before taking a break. So even if these records *could* help illuminate the severity of Joshua's pain, the ALJ's failure to consider the evidence as a whole is tantamount to "analyz[ing] only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

The written decision's logical bridge also breaks down when examining the ALJ's explanations on why Joshua's self-reported pain was purportedly exaggerated. First, the ALJ cited Joshua's ability to perform daily activities, albeit slowly, as a reason that he could still work. AR1 at 27. As an initial matter, however, "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *see also Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (remanding case to ALJ in part because ALJ "ignored [claimant's] qualifications as to *how* he carried out [daily] activities" (emphasis in original)). As one example, the 'ability' to button a shirt even though it takes 45 minutes to do so, AR1 at 42–43, has little relevance in showing that the performance of daily activities at a slower pace supports a finding of residual functional capacity.

And the ALJ here again "analyze[d] only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore*, 743 F.3d at 1123. Although the ALJ initially recited Joshua's hearing testimony, AR1 at 23, the ALJ did little more. So in concluding that Joshua could not be in serious pain on account of his ability to "handle activities of daily living," *id.* at 27, the ALJ did not discuss the significant evidence presented, including at the hearing and in-person medical examinations, detailing all of Joshua's struggles to dress himself, cook any non-microwavable food, sit for more than ten minutes, walk for more than a few hundred feet, or move around his home without the assistance of a cane or walker. *See, e.g.*, *id.* at 41–44, 46, 49, 51, 302, 523–24. The Court emphasizes again that "the problem

15

is not that the ALJ weighed the evidence in a certain way" but rather that the ALJ "ignore[d] an entire line of evidence contrary to her ruling." *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020). The ALJ is not required either to rely on or (instead) to reject any evidence, including Joshua's hearing testimony, but the ALJ needed to at least discuss it in the analysis.

Second, the ALJ also determined that the intensity, persistence, and limiting effects of Joshua's pain were overstated because he did not pursue "more aggressive forms of treatment" than modest pain medication. AR1 at 28. But the Court agrees with Joshua that the ALJ "ignored explanations for the conservative treatment." *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015). Joshua testified that he wanted to avoid the cognitive effects of opiate-based medications. AR1 at 44–45. And his medical records confirm that he considered, and sometimes tried, injections and surgery: injections did not alleviate his shoulder pain, and the spine doctor at the Mayo Clinic did not think injections or surgery would help. *Id.* at 346, 670. Joshua's conservative treatment thus too cannot support a logical bridge from the evidence to the ALJ's conclusion. *See Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014).

The Court next considers the ALJ's assessment of Dr. Harding's opinions.[7] Joshua contends that the ALJ did not explain why telehealth appointments would

---

[7]Here the Court does not discuss the correlated argument about whether Dr. Harding's opinion was entitled to controlling weight as Joshua's treating physician. Both parties acknowledge that Joshua does not contend that the ALJ erroneously evaluated Dr. Harding's opinions, R. 18, Pl.'s Reply at 4; Def.'s Br. at 10, so the Court avoids considering this waived argument.

undermine the veracity of his self-described pain. Pl.'s Br. at 13. But the ALJ explained why: Dr. Harding would be unable to verify over a video call whether Joshua was accurately reporting the severity of his pain. AR1 at 28.

Even so, the ALJ's reasoning warrants some pause. The ALJ acknowledged that Dr. Harding did in fact see Joshua in person twice, but the ALJ dismissed the relevance of those examinations because the most recent visit (August 2021) was more than a year before the September 2022 hearing. AR1 at 24, 28. But the state agency's only in-person examination of Joshua is similarly outdated (September 2021). *Id.* at 523. Indeed, the most recent examination in the record comes from Joshua's battery of tests at the Mayo Clinic in November 2021—a set of results that corroborate his widespread pain, the severity of that pain, and his underlying fibromyalgia. *Id.* at 645–46. So the ALJ's stated basis for discounting Dr. Harding's in-person examinations applies with equal force to the report the ALJ more heavily relied on, undermining any "accurate and logical bridge between the evidence and the result." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018) (cleaned up); *see also Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021) ("[A]n internally inconsistent opinion by an ALJ is likely to fail to build a logical bridge …."). And there is no discernible reason provided by the ALJ why Joshua's *degenerative* conditions would improve in the time since his in-person examinations. The ALJ thus came close to "play[ing] doctor when [s]he ignored expert opinions to arrive at [her] own … interpretation of the medical evidence." *Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016).

17

But this is not to say, as Joshua contends, that the ALJ erred by imposing *more* limitations than the state-agency physicians did on the work that Joshua could perform. Pl.'s Br. at 9–12. The government rightly points out that the ALJ should not be worse off for being more pro-claimant by adding limitations after reviewing the medical evidence. Def.'s Br. at 4 (citing *Patrick C. v. Saul*, 2020 WL 6287370, at *8 (N.D. Ill. Oct. 27, 2020)). True, the ALJ must properly assess, and cannot disregard, the evidence in crediting or rejecting the medical and testimonial evidence, *Hill*, 807 F.3d at 869, but it is not reversible error to deviate from a physician's assessment of a claimant's limitations, *cf. Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); *see also Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's [residual functional capacity] is a matter for the ALJ alone—not a treating or examining doctor—to decide."). Although the government is right on this one point, the ALJ's analysis was not supported by substantial evidence, as explained above.

## IV. Conclusion

The government's motion for summary judgment, R. 16, is denied. The Court instead grants Joshua's motion, R. 12, and vacates the Commissioner's decision. The case is remanded for further proceedings consistent with this Opinion.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 27, 2026

18